UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEROY GRAYSON and ALVIN MCKENZIE, on behalf of themselves and all other similarly situated,<br><br>                            Plaintiffs,<br>    vs.<br><br>7-ELEVEN, INC., a Texas Corporation, and DOES 1 through 100, inclusive,<br><br>                            Defendants. | CASE NO. 09cv1353-GPC(WMC)<br><br>**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Dkt. Nos. 57, 58.] |

    Before the Court are both parties' motions for summary judgment as to all the claims in the first amended complaint. (Dkt. Nos. 57, 58.) Both parties filed oppositions to the motions for summary judgment on December 14, 2012. (Dkt. Nos. 60, 61.) Replies were filed on January 4, 2013. (Dkt. Nos. 62, 63.) The motions are submitted on the papers without oral argument pursuant to Civil Local Rule 7.1(d)(1). After a review of the briefs, supporting documentation, and applicable law, the Court DENIES Plaintiffs' motion for summary judgment and GRANTS Defendant's motion for summary judgment.

**Procedural Background**

    On June 23, 2009, Plaintiffs Leroy Grayson and Alvin McKenzie brought this nationwide class action against Defendant 7-Eleven, Inc. seeking to recover federal excise tax refunds issued to 7-

Eleven. (Dkt. No. 1.) Plaintiffs filed the operative First Amended Complaint ("FAC") on August 10, 2009. (Dkt. No. 10.) The FAC asserts three causes of action: (1) conversion; (2) money had and received; and (3) breach of implied contract. (Id.)

On July 21, 2010, the parties submitted a joint motion stipulating to class certification of a nationwide class under Federal Rule of Civil Procedure 23, which the Court granted. (Dkt. Nos. 24, 25.) Subsequently, the parties filed cross-motions for summary judgment. (Dkt. Nos. 31, 32.) Upon review of the parties' summary judgment pleadings, on June 10, 2011, the Court concluded that decertification of the nationwide class was necessary and vacated its prior order without prejudice to Plaintiffs renewing the motion for certification of a redefined class. (Dkt. No. 42.) The parties withdrew their motions for summary judgment. (Dkt. Nos. 45, 46.)

On August 15, 2011, Plaintiffs filed a motion to certify class action. (Dkt. No. 47.) Defendant did not oppose. On March 28, 2012, the Court granted Plaintiffs' motion for class certification. The class is defined as

> All former franchisees of Defendant 7-Eleven, Inc., located in the state of California who (1) paid a portion of the federal excise tax levied against pre-paid long distance telephone cards sold to the public from July 2000 through July 2006; (2) terminated their franchise agreements with 7-Eleven at any time between July 2000 to September 2007; and (3) for whom 7-Eleven has not paid their pro-rata portion of the excise tax refund as of December 8, 2008.

On October 9, 2012, the case was transferred to the undersigned judge. (Dkt. No. 55.) On October 19, 2012, both parties filed their respective motions for summary judgment. (Dkt. Nos. 57, 58.) Both parties filed their respective oppositions on December 14, 2012. (Dkt. Nos. 60, 61.) On January 4, 2013, the parties filed their replies. (Dkt. Nos. 62, 63.)

**Factual Background**

In March 1987, Plaintiff Leroy Grayson executed a Store Franchise Agreement with 7-Eleven. (Dkt. No. 60-1, Pls' Statement of Genuine Issues in Opp. to D's MSJ, No. 1.) In May 1992, Plaintiff Alvin McKenzie executed a Store Franchise Agreement with 7-Eleven. (Id., No. 2.) McKenzie executed a replacement Store Franchise Agreement in May 2004. (Id., No. 3.) Grayson executed a "Release of Claims and Termination" agreement on November 1, 2004 and McKenzie executed a

"Release of Claims and Termination" agreement on September 1, 2005. (Id., Nos. 4, 5.)

Starting in or before the year 2000, the federal government collected federal excise taxes on all pre-paid long distance telephone cards ("PTCs") sold to the general public. (Dkt. No. 61-1, D's Response to Ps' Separate Statement, No. 1.) Thousands of pre-paid long distance telephone cards were sold by 7-Eleven franchisees throughout the United States. (Id., No. 2.) The excise tax was levied on 3% of the total purchase price of each phone card sold, depending on its denomination. (Id., No. 3.) The actual entity that delivered the total tax payment to the federal government was 7-Eleven.[1] (Id., No. 5.) The federal government stopped collecting the excise tax on long distance pre-paid phone cards in June or July 2006. (Id., No. 6.) The U.S. Treasury authorized a one-time refund of the tax collected from all entities who paid the tax from March 2003 through July 2006. (Id., No. 7.) When the federal government ceased collection of the tax and started the refund procedure around mid-2007, Defendant 7-Eleven did not notify its former franchisees about the refund. (Id., No. 8.)

7-Eleven took affirmative steps to file claims with the U.S. government to obtain refunds for 100% of all taxes paid during the July 2000 through July 2006 time period. (Id., No. 11.) In late 2008, Plaintiffs learned that the U.S. government made its first refund payment to 7-Eleven for millions of dollars in taxes paid during the "collection period." (Id., No. 12.) Grayson, upon discovering the fact that payments had been issued by the U.S. Treasury, gave notice to 7-Eleven requesting the accounting and refund. (Id., No. 14.) Former franchisees who had no franchise agreement in effect as of September 18, 2007 were not paid any portion of the excise tax. (Id., No. 15.)

In March 2007, the IRS notified 7-Eleven it had accepted 7-Eleven's refund claim in its entirety. (Dkt. No. 60-1, Pls' Statement of Genuine Issues in Opp. to D's MSJ, No. 12.) The IRS placed no conditions on 7-Eleven's receipt of the refund money. (Id., No. 13.) 7-Eleven decided to share the refund with current franchisees because the refund was similar to a vendor discount or allowance in that it reduced the cost of goods sold. (Id., No. 14.) It even provided refunds to former franchisees who are also current franchisees. (Dkt. No. 63-1, Hanson Decl. ¶ 5.) 7-Eleven decided to distribute portions of the refund allocable to their former franchisees solely as a gesture of goodwill

---

[1] 7-Eleven notes in its opposition that technically, 7-Eleven paid the tax to the telecommunications companies, which are responsible for collecting the tax and paying it over to the government. (Dkt. No. 61, D's Opp at 16 n. 3.)

towards individuals with whom it has an ongoing business relationship and not based on any legal obligation. (Id.)

In order to fully understand the payment of the excise tax, 7-Eleven describes the framework for invoicing and payment with franchisees pursuant to the Franchise Agreement. (Dkt. No. 57-9, Hanson Decl. ¶ 8.) The franchisee places an order with a vendor for goods or services. (Id. ¶ 9.) The franchisee submits the invoice for those goods or services to 7-Eleven and 7-Eleven pays the vendor for those goods and services, with funds from a 7-Eleven bank account. (Id. ¶¶ 9-10.) 7-Eleven then charges the franchisee for that cost, through a mechanism known as the "Open Account," which 7-Eleven establishes and maintains for each franchisee. (Id. ¶ 9.) All amounts owed by the franchisee to 7-Eleven (including for goods paid for by 7-Eleven) are charged to the Open Account, and all sales receipts are credited to the Open Account. (Id. ¶ 9.) The franchisee pays the debt he or she owes to 7-Eleven for 7-Eleven's payment of invoices with his or her sales receipts. (Id. ¶ 9.)

In contrast to most franchise systems, which require the franchisee to pay the franchisor a percentage of sales receipts, 7-Eleven and the franchisees split each store's gross profit. (Id. ¶ 7.) Gross profit is defined in the Franchise Agreement as net sales less cost of goods sold. (Id.) The percentage of gross profit to which 7-Eleven is entitled is known as the "7-Eleven Charge." (Id.) Depending on the form of Franchise Agreement, the 7-Eleven Charge generally varies between 50 and 55%. (Id.) Occasionally, 7-Eleven and its franchisees receive discounts and allowances from vendors. (Id. ¶ 8.) In general, when the discount or allowance is purchase based (that is, directly tied to the volume of purchases made for a particular item), it will be credited to the cost of goods sold on a pro-rata basis for each franchisee selling the item. (Id.) This reduces the cost of goods sold, and thereby increases the amount of gross profit available for 7-Eleven and 7-Eleven franchisees to split. (Id.)

As to the PTCs, 7-Eleven entered into system-wide contracts with telecommunications companies selling prepaid phone cards. (Id. ¶ 11.) These contracts all provided that 7-Eleven is obligated to pay the telecommunications company for all cards ordered by 7-Eleven stores. (Id.) The price 7-Eleven paid for the cards included all taxes, including all federal excise taxes. (Id.) In compliance with the Franchise Agreement, 7-Eleven would then debit the franchisee's Open Account

in an amount equal to the cost of the phone cards ordered, and the franchisee would generally pay that debt with his receipts from store sales. (Dkt. No. 57-1, D's Opp at 10.)

While Defendant emphatically states that "7-Eleven, and only 7-Eleven" paid the telecommunications companies for the prepaid long-distance telephone cards ("PTCs"), and therefore, it was entitled to the excise tax refund, it does not dispute that the franchisees bore the burden of 50% of the excise tax. (Dkt. No. 57-3, Hoffman Decl. ¶ 10.) Similarly, Plaintiffs do not dispute that 7-Eleven paid the taxes; however, they claim the excise tax was split between them according to their Franchise Agreements. They assert that they were responsible for 50% pro rata share of excise tax as the taxes were paid from "Cost of Goods" as an expense and their profit was reduced by 50% of the taxed. (Dkt. No. 58-14, Grayson Decl. ¶ 3; Dkt. No. 58-15, McKenzie Decl. ¶ 3.)

In essence, both parties do not dispute that the tax was paid by 7-Eleven and 50% of the excise tax was paid by the franchisees as the cost of the phone cards were debited from the franchisee's Open Account pursuant to the Franchise Agreement. The excise tax cut into the profit margin because the franchisor and franchisee would have made a greater profit on the calling cards if the excise tax was not built into their cost. As a result, the franchisees' share of the tax was essentially split with 7-Eleven based on the profit margin. Plaintiffs seek their 50% pro rata share of excise tax from July 2000-November 1, 2004 as to Grayson and McKenzie seeks his 50% pro rata share of excise tax from July 2000 - September 1, 2005.

## Discussion

### A.   Legal Standard for Motion for Summary Judgment

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 327 (1986). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material when it affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. Celotex Corp., 477 U.S. at 323. The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial. Id. at 322-23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. Id. at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." Fontana v. Haskin, 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. Anderson, 477 U.S. at 255.

**A.     Release Agreement**

The threshold question is whether the release signed by Plaintiffs, when they terminated their franchise agreements, bar their claims against Defendant. Defendant argues that the releases executed by both Plaintiffs when they terminated the franchise agreements in 2004 and 2005 bar their claims for a refund that 7-Eleven received in 2007. Plaintiffs contend that California Civil Code section 1668 prevents the releases from excusing Defendant's intentional wrongdoings. Plaintiffs allege the torts of conversion; money had and received and breach of implied contract and they allege these causes of action include a requisite element that Defendant engaged in the intentional act of withholding property belonging to Plaintiffs.

Under the "Release of Claims and Termination Agreement," Plaintiffs and 7-Eleven mutually

released

> all claims . . . obligations, debts . . . liabilities . . . suits or causes of action . . . of every kind and nature, whether known or unknown, foreseen or unforeseen, direct, indirect, contingent or actual . . . which have arisen or which might or could arise . . . from any relationship, incident or transaction arising or occurring under the Agreement . . . or from the execution, operation under or termination of the Franchise Agreement . . . or under any other agreement relating to the Store, existing or arising at any time before or at the time of the execution of this Agreement, are hereby mutually satisfied, acquitted, discharged and released . . . being the express intention of you and us that this release be as broad as permitted by law.

(Dkt. No. 57-12, Hanson Decl., Ex. C., McKenzie Release ¶ 2; Dkt. No. 57-14, Hanson Decl., Ex. E, Grayson Release ¶ 2.)

California Civil Code section 1668 provides that all "contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." Cal. Civil Code § 1668.

California Civil Code section 1668 invalidates the release of liability for future wrongdoing. Watkins v. Wachovia Corp., 172 Cal. App. 4th 1576, 1587 n. 12 (2009) (Section 1668 "is meant to prohibit contracts releasing liability for future torts not to prohibit settlements of disputes relating to past conduct."). Generally, California Civil Code section 1668 invalidates contracts that purport to exempt an individual or entity from liability for future intentional wrongs, gross negligence, and violations of the law. Farnham v. Superior Court, 60 Cal. App. 4th 69, 74 (1997); see also City of Santa Barbara v. Superior Court, 41 Cal. 4th 747, 777 (2007) (gross negligence); Capri v. L.A. Fitness International, LLC, 136 Cal. App. 4th 1078, 1083-1087 (2006) (negligence per se). In addition, Civil Code section 1668 prohibits contractual releases of future liability for simple negligence claims only when "the 'public interest' is involved or [ ] a statute expressly forbids it." Farnham, 60 Cal. App. 4th at 74; see also Tunkl v. Regents of Univ. of California, 60 Cal.2d 92, 98 (1963).

The Court now addresses whether Plaintiffs' claims for conversion, money had and received, and implied breach of contract fall under the provisions of California Civil Code section 1668.

**1. Conversion**

"Conversion is the wrongful exercise of dominion over the property of another. The elements

of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages. Conversion is a strict liability tort. The foundation of the action rests neither in the knowledge nor the intent of the defendant. Instead, the tort consists in the breach of an absolute duty; the act of conversion itself is tortious. Therefore, questions of the defendant's good faith, lack of knowledge, and motive are ordinarily immaterial." Los Angeles Federal Credit Union v. Madatyan, 209 Cal. App. 4th 1383, 1387 (2012) (quoting Burlesci v. Petersen, 68 Cal. App. 4th 1062, 1066 (1998)).

Absent a public interest, section 1668 does not invalidate a release from simple negligence or strict liability claims. Buchan v. U.S. Cycling Fed'n, Inc., 227 Cal. App. 3d 134, 150 (1991). As stated in Madatyan, conversion is a strict liability tort. Madatyan, 209 Cal. App. 4th at 1387; see also Moore v. Regents of Univ. of California, 51 Cal. 3d 120, 144 & n. 38 (1990); Burlesci v. Peterson, 68 Cal. App. 4th 1062, 1065 (1998) (the "foundation for the act of conversion rests neither in the knowledge nor the intent of the defendant.")[2]

Defendant argues that there is no public interest factor in a franchisor-franchisee relationship and cites to Keating v. Superior Court, 31 Cal. 3d 584, 594 (1982) (rev'd in part on other grounds by Southland Corp. v. Keating, 451 U.S. 1 (1984)) where the court stated that the franchisor-franchisee relationship does not involve a "service of great importance to the public." Plaintiff does not assert or address the public interest involved. Accordingly, the Court concludes that there is no public interest impact as to the releases. See also Frittelli, Inc. v. 350 North Canon Drive, LP, 202 Cal. App. 4th 35, 43-44 (2011) (a commercial lease between business entities does not implicate the public interest). Accordingly, the Court concludes that California Civil Code section 1668 does not invalidate the release as to the conversion claim.

**2.    Money Had and Received**

A claim for money had and received is stated if it is alleged the defendant "'is indebted to the plaintiff in a certain sum 'for money had and received by the defendant for the use of the plaintiff.'" Farmers Ins. Exchange v. Zerin, 53 Cal. App. 4th 445, 460 (1997) (quoting Schultz v. Harney, 27 Cal.

---

[2] While there is a California appellate case that held that conversion is an intentional tort, see Collin v. American Empire Ins. Co., 21 Cal. App. 4th 787, 812 (1994), a more recent appellate case held that conversion is a strict liability claim. See Madatyan, 209 Cal. App. 4th at 1387.

App.4th 1611, 1623 (1994)). The elements of money had and received do not require any showing of intentional wrongdoing or gross negligence. Therefore, the claim for money had and received is barred by the releases signed by Plaintiffs.

### 3. Breach of Implied Contract

A breach of implied contract or quasi-contract is "simply another way of describing the basis for the equitable remedy of restitution when an unjust enrichment has occurred." McBride v. Boughton, 123 Cal. App. 4th 379, 388 n. 6 (2004). An implied contract is "an obligation created by the law without regard to the intention of the parties . . . ." Id. Therefore, breach of implied contract does not involve an intentional tort. The Court concludes that the breach of implied contract claim does not fall under California Civil Code section 1668.

Without providing any legal authority, Plaintiffs seeks the Court to construe section 1668 to include the "intentional act of withholding property belonging to Plaintiffs" and not an intentional wrong as required by California case law. McQuirk v. Donnelley, 189 F.3d 793, 798 (9th Cir. 1999) (holding that Plaintiffs' claims for defamation, interference with business expectancy and intentional infliction of emotional distress are all intentional wrongs). Moreover, no California court has addressed whether these three causes of action would bar a release under California Civil Code section 1668.

In sum, the Court concludes that the claims sought by Plaintiffs in the first amended complaint are barred by the Release of Claims and Termination. Accordingly, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendants' motion for summary judgment.

### Conclusion

Based on the above, the Court DENIES Plaintiff's motion for summary judgment and GRANTS Defendants' motion for summary judgment. The Clerk shall enter judgment accordingly.

IT IS SO ORDERED.

DATED: March 21, 2013

HON. GONZALO P. CURIEL
United States District Judge